84  429
67a 529

Toledo, Wabash and Western Railway Company

*v.*

Susan A. Asbury, Admx.

1. Railroad company—*duty to furnish safe machinery.* It is the duty of railroad companies to furnish good, well constructed machinery, adapted to the purposes of its use, of good material and of the kind that is found to

be safest when applied to use; and whilst they are not required to seek and apply every new invention, they must adopt such as is found by experience to combine the greatest safety with practical use.

2. EMPLOYEE—*required to use care commensurate with danger of employment*. Although machinery furnished by a railroad company for the use of its employees may be unsafe, yet if an employee, knowing the character of the machinery, continues to use it, he is bound to exercise care commensurate with the danger; and if he fails to do so, and is injured, his negligence will preclude a recovery against the company on account of such injury.

APPEAL from the Circuit Court of Sangamon county; the Hon. CHARLES S. ZANE, Judge, presiding.

Messrs. HAY, GREENE & LITTLER, for the appellant.

Mr. N. M. BROADWELL, and Mr. W. M. SPRINGER, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

The administratrix of Joseph T. Asbury brought an action on the case to recover damages for causing the death of her husband, by the railroad company.

It is averred in the declaration, the company had in their possession and use a passenger coach with a draw bar and coupling, used to connect it with other cars, and were in possession of and using a sleeping car also furnished with a draw bar and coupling, to be used to connect it with other cars; that these draw bars and couplings were so constructed as to be unsafe, unsuitable and dangerous to persons whose duty it was to form a coupling with· them; that plaintiff's husband was a brakeman, and it was his duty to couple these cars, and whilst so doing, by reason of the unsafe and unsuitable draw bars, he was caught between the platforms of the cars and was killed.

The evidence shows, that one of the cars was provided with what is known as the "Miller" draw bar, and the other with an ordinary draw bar; that in using two such draw bars in coupling, the ends were liable to slip past each other, and thus

bring the platforms near together.   It also appears, that the
company had, to some extent, introduced or were using cars
with the "Miller" draw bar on their road.   It also appears,
that in making a coupling with ordinary draw bars, their ends
or heads strike square against each other, and thus arrest the
approach of the platforms.   It also appears, that as brakeman
it was the general duty of deceased to couple the cars, but in
this case he was not specially ordered to do it.   And it appears,
in making the coupling the brakeman must go between the
cars or on one of the platforms for the purpose.

On the occasion of the death of the husband of appellee, he
was connected with a special train, used in conveying a circus
company to different points on the company's road.   This
train had been to Keokuk and Quincy, and had run to Bluff
City, east of the Illinois river, to get on the Hannibal branch
of their road, for the purpose of going to that place.   On
reaching Bluff City, it became necessary to change the posi-
tion of the engine and cars, so as to go in the opposite direc-
tion.   The engine was reversed on a turn table, and the cars
were so switched as to place them in a proper position; but
in coupling the sleeping car to a passenger coach, the proper
connection was not made, and the draw bars passed each other
and locked.   Thereupon deceased, with others, endeavored to
separate them, by the use of an iron bar and other levers, but
failed.   The engine was then put in motion, under the suppo-
sition that the sleeping car, which was behind, would hold
until the train was removed from the main line to the branch
road, but it became detached.   Thereupon, the conductor, de-
ceased and another pushed the sleeping car forward on the
track, for the purpose of making the coupling.   When the
two cars approached near to each other, deceased went forward
and between the cars to couple them.   Whilst there he received
the injuries which caused his death.   He was seen to go be-
tween the cars, and whilst there was heard to say: "Look out,
or they may come together again."   He almost immediately
came out, and walked, unassisted, to a bank near the road, and
sat down.   On those present approaching him, he seemed to

be in great pain, and unable to speak, and was put on the pay car, which was then passing, and died in about a half hour after he was injured.

On this state of facts, the jury found a verdict in favor of plaintiff, and assessed her damages at $3000. A motion for a new trial was entered and overruled, and judgment was rendered on the verdict, and the company appeals.

It is first urged, that the verdict is not sustained by the evidence. As to the main facts of the case there is no conflict, and hence the question is, whether the verdict is against the testimony.

It is claimed by appellee, that the company was negligent in furnishing such couplers to these cars, and should be held liable; but this the company denies, claiming that such appliances are in constant use, and are not unusually hazardous. The company claims that deceased was guilty of negligence to such a degree, that, even if the company was guilty of some negligence, a recovery can not be had, whilst appellee insists he was not shown to have been guilty of any negligence.

It appears that deceased had been a railroad man for about five years, most of the time a brakeman; that he was energetic, active, and understood and performed his duties well, and to the satisfaction of his employers. It also appears that he had been in the habit of making connections with the " Miller " and the ordinary draw bars for years; that he had, at no time, objected to their use, or that they were extra hazardous. From the length of time he was engaged in this employment, and his experience in making this character of couplings, he must have had a thorough knowledge of its character and hazards, and have been fully qualified to know, and fully understand, what prudence and sound discretion required when so engaged. With him it was unlike an inexperienced employee. He must have been as capable of judging of the adaptability of these couplers as engineers or conductors on the road. He had acquired his knowledge from actual experience, and which, unlike theory, was real, and not liable to uncertainty or mistake. He, then, must have known the extent of the peril incurred

by passing into the space between the cars, and it appears that he and other brakemen were not required to couple if there was great danger.   He must be presumed to have understood the extent of the hazard he was incurring when he went between these cars, and had he considered it more than ordinarily perilous, he might have declined the performance of the duty. No one saw how the accident occurred—whether it was by the passing of the draw bars, and his being pressed between the platforms of the cars, or by being struck by the ends of the bars as they came together.   There appeared to be no external injury, except a bruise or spot on his back, about an inch in diameter.

Knowing, as he did, the liability of the ends of these draw bars to pass each other, and the platforms to come together, we must regard it almost reckless on his part to go in between them when the cars were coming together.   These draw bars had so passed and locked not a half hour before, and he had aided in the endeavor to disengage them.   It would have been extremely negligent for even a person having little or no experience in such matters, after seeing them pass and lock but a few minutes before, to go into such a place of extreme peril. All could see and know that it was highly dangerous.   It did not require the skill of an expert to know that fact; but even if it did, we may well presume he was one of no ordinary skill. We think his negligence was great in incurring the danger that led to the loss of his life; and whether he was crushed by the ends of the draw bars or the platforms, can not, in the slightest degree, vary the result, as to be so caught by either was the result of going between them, when we must presume he knew it was attended with great risk to his life.

It again appears, that had the coupling link been fast in the head of the ordinary draw bar, they could not have passed and the platforms have come together and crushed him.   With his experience he must have known that such was the fact, and if so, it was gross negligence for him not to have the link so placed, to secure his safety.   The safety that thus could be produced, does not seem to be disputed, and it appears the

28—84TH ILL.

coupling could have been readily made with the link in the head of the ordinary draw bar. To fail, under the circumstances appearing in evidence, to so place the link, was almost extreme carelessness.

It is, however, urged, that it was negligence for the company to furnish cars with such draw bars. The company is bound to furnish safe, well constructed and proper machinery for their employees, and failing to do so, they are responsible for all injury occasioned thereby. This, as a general proposition, is true, but is subject to some limitations. We presume no one will claim that any kind of draw bars are absolutely safe. The "Miller" draw bars, when used on passenger cars, may be regarded as safe, as they are self-coupling, when brought together, without the intervention of a brakeman or other person; but they are not practicable on freight trains, as with them such trains can not be readily started when standing. The duty of the company is to furnish good, well constructed machinery, adapted to the purpose of its use, of good material, and of the kind that is found to be the most safe when applied to use. They are not required to seek and apply every new invention, but must adopt such as is found, by experience, to combine the greatest safety with practical use.

But in this case there is no proof that the use of these two draw bars in connection is regarded as extra hazardous. They seem to have been rather generally in use on this road, and there is nothing appearing to show that other accidents had occurred thereby, to induce the belief that they were more dangerous than ordinary couplings, if proper care was observed in their use. But even if they were not so safe, deceased, who had long coupled them, made no complaint, nor did he report they were dangerous, to those having charge of such matters. If not proper, he, of all others, by using them, could have known the fact, and should have so reported. He knew the hazards of the employment, and contracted with a view to them, and was bound to exercise care commensurate with the danger. This he failed to do, and so failing, his negligence must preclude a recovery, even if the company could be held

to have been guilty of negligence, which is not, we think, shown by the evidence in this case.

The judgment of the court below must be reversed.

*Judgment reversed.*